George **WELLER**, Appellant,

v.

**UNITED STATES of America,**
**Appellee.**

No. 20513.

United States Court of Appeals
Ninth Circuit.

Dec. 14, 1966.

Joseph H. Soble, Tucson, Ariz., for appellant.

Sidney I. Lezak, U. S. Atty., Jack G. Collins, Asst. U. S. Atty., Norman Sepenuk, Sp. Asst. U. S. Atty., Portland, Or., for appellee.

Before CHAMBERS, HAMLEY and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

Weller was found guilty by a jury under each of ten counts of an indictment charging mail fraud (18 U.S.C. § 1341). He was sentenced to five years on each count, all sentences being concurrent. On this appeal he is represented by new counsel. Their principal contention is that trial counsel did not competently represent him. We affirm.

For many years Weller solicited advertising in the Northwest, including the State of Oregon, for magazines published in San Francisco by one Whitfield. The principal magazine was originally known as "The Masonic Star." Its name was later changed to "The Fraternal Star" and to "The Star." Another was called "The Trestle Board." In 1959 the Whitfields sold their business to one Danrich. Weller continued to solicit advertising in the same territory for Danrich.

There is some evidence that in previous years "The Star" and its predecessors had some circulation in the Northwest, mostly, however, of a complimentary character. "The Trestle Board" had never had any circulation in the Northwest, and Weller had not solicited advertising for it in that territory.

During the time covered by the indictment, from March 1960 to December 1961, Danrich printed two magazines, one called "The Star," the other called "The Trestle Board." Each magazine was purportedly one directed at and publishing material of interest to Masons and Masonic Lodges. When Danrich bought the business, "The Star" had no subscribers and no circulation. This was equally true of "The Trestle Board." Each magazine was made up by copying material from other publications and consisted principally of advertising, together with such fillers. Three copies of "The Star", the "Fall Issue", 1960, the "Summer Issue," 1961, and the "Winter Issue", 1961, and one copy of "The Trestle Board," dated August 1961, are in evidence. The trial court, in the absence of the jury, remarked to counsel that they reek of fraud. Our examination of them corroborates his view. As magazines, they could hardly be of interest to anyone.

During the period in question, and for many years before that, Weller was the only person who solicited advertising for either publication in the Northwest. He lived in California, at Bakersfield, but travelled to the Northwest to solicit advertising. He arranged with one Elliott, who had a telephone answering service in Salem, Oregon, for use of Elliott's telephone, and in 1960, to have mail sent to Elliott and by him forwarded, unopened, to Danrich. Weller provided Elliott with pre-addressed envelopes for that purpose. When Danrich took over, Weller insisted that any complaining letters or letters

asking questions be sent back to Weller, rather than answered by Danrich. Danrich kept track of remittances, retained one-half, and paid the other half to Weller.

Most of the advertising for "The Star" was solicited by Weller by telephone. Some was solicited by mail and some in person. He represented that he was calling for the Masons, or for the Eastern Star, or from the Temple.

Billheads were printed for "The Star", giving its address as that of the Salem mail drop and carrying the legend "Of Interest to Masons, Shriners, Scottish Rite, York Rite, DeMolay, Eastern Stars, Amaranths, Job's Daughters and all Affiliated Bodies." When he obtained an order for an advertisement, Weller sent the buyer such a bill, together with a return envelope addressed to "The Star" at the mail drop. When a copy of the magazine was printed, Danrich, on Weller's instructions, sent a "tear sheet," that is, a single page, on which was printed a copy of the ad in question, to the person who had paid for the ad. Some buyers did not pay until they got the "tear sheet." In that case, the "tear sheet" was accompanied by a second bill, on the same billhead.

Weller conceived the idea of soliciting additional advertisements for "The Trestle Board." To that end, he had Danrich print billheads showing the mail drop as the address and headed "The Trestle Board." They have the legends "Established 1887" and "The Oldest Masonic Publication West of the Mississippi Featuring News and Items of Interest to Masons, Shriners and All Affiliate Bodies." These billheads also stated "We are now compiling the next edition of the Trestle Board and shall appreciate it if we may publish your listing in the amount of". The copies of this billhead that are in evidence refer, in typewriting, to "Christmas Issue" or "Xmas Shrine Issue" or "Xmas Shrine Edition '61". Weller used a "tap list" for the names taken out of an issue of the Masonic Review Digest, and in December, 1961, mailed out about 450 of these bills from a motel in Coos Bay, Oregon, where he registered under the name of Miller. An amount for advertising was entered on each bill; one of the bills in evidence shows $20, another $10, and a third $15. The amounts of the bills have nothing to do with the size of the ad which was to be placed. No such publication as is referred to in these bills was ever printed.

There is testimony by purchasers of advertising that they believed that by buying ads they were helping Masonry and that the ads had some value. When advertisers asked Weller about circulation he told them "I am not in that department." When asked where the money went, he said "it goes toward publication." He told a postal inspector that the publications do no service at all for Masonry and volunteered the following statement: "Do you want to know my real purpose in this business, Mr. Severtson? I salve my conscience every night that I'm really helping Masons because each time I solicit ads and a few more business people get more disgusted, I am doing a little more to get rid of this kind of racket."

The first attack on trial counsel's conduct of the case is based upon the fact that when several of the victims testified about calls that they received and identified the billings that they had received, the checks that they had sent for ads, and the tear sheets that they had received, counsel did not object. At that stage of the trial the calls and documents had not been connected with Weller and the objection would then have been good. After several such witnesses had testified, the court inquired as to the possibility of a stipulation, to shorten the trial. It was then stipulated that, if witnesses were called, they would testify that certain exhibits were received by them in the mail, or mailed by them, and 6 exhibits, consisting of billheads, envelopes, checks and tear sheets, were received. It is claimed that this stipulation, too, indicates that counsel was incompetent.

The difficulty with the argument is that the trial court had required the gov-

ernment to give to trial counsel, in advance of the trial, copies of all statements of government witnesses, including two statements given by Weller to the postal inspector Severtson. Trial counsel thus knew that Weller had admitted the whole scheme to Severtson and that Severtson was going to be a witness. They also knew what the testimony of the other witnesses would be. Had Severtson taken the stand first, the testimony and documents would then clearly have been admissible to show use of the mails in the course of the scheme and that is the purpose for which they were received. No doubt trial counsel felt that there was no use to make an objection which was bound eventually to be overruled and thereby to prejudice his case in the eyes of the jury. Moreover, the stipulation kept from the stand a parade of six victims of the scheme. Counsel's tactics were good, not bad.

▮ The second contention is that trial counsel should have made a motion to suppress the statements given to Severtson. Severtson's testimony, confirmed by Weller's, shows that Severtson asked Weller to come to see him, that Weller drove from Bakersfield, California to Portland, Oregon, for that purpose, that he was not arrested, that his constitutional rights were fully explained to him, and that he gave the statements voluntarily. Most of these facts appeared on the face of the statements. No doubt trial counsel concluded, particularly after consulting with Weller as to his story, that an attack upon these statements would have been futile. We certainly cannot say that failure to attack them by moving to suppress them was poor tactics, much less that it indicates incompetence. By not moving to suppress, counsel withheld from the government Weller's version, which first came out when Weller took the stand. Counsel did cross-examine Severtson as to the circumstances under which the statements were given and was thus in a position to argue their weight to the jury.

Other attacks upon trial counsel assert that certain letters written by Weller to Danrich should have been objected to on the ground that they were irrelevant and immaterial. There is no merit in the point. Other errors assigned are similar to the foregoing, but have even less merit. Weller had a fair trial, and he was clearly guilty.

Affirmed.